## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHARIF MOBLEY, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 1:11-cv-02072 (BAH) |
| CENTRAL INTELLIGENCE AGENCY, | * | |
| *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiffs Sharif Mobley ("Mobley"), an American citizen arrested and imprisoned in

Yemen at the behest of the United States government for alleged ties to al'Qaeda, and his wife

Nzinga Islam ("Islam") brought this case against Defendants Central Intelligence Agency

("CIA") and Department of State ("State") after these agencies failed to properly process their

Freedom of Information Act ("FOIA") and Privacy Act (collectively "FOIA/PA") requests

regarding the U.S. government's role in Mobley's arrest and incarceration.  (Compl. ¶¶ 8, 16.)

On 25 May 2012 Defendants filed a Motion for Summary Judgment under Rule 56(a) of the

Federal Rules of Civil Procedure, which they supplemented on 29 June 2012 to address records

that State referred to the U.S. Army Office of the Provost Marshal General ("OPMG").

## BACKGROUND

### Factual and Procedural Background

Except as specifically indicated otherwise, Plaintiffs accept Defendants' recitation of the

factual and procedural background of this Motion (Defs.' Mem. Supp. Defs.' Mot. Summ. J.,

Dkt. #22, at 2-4 [hereinafter Defs.' Mem.]; Defs.' Mem. Supp. Def. State's Suppl. Mot. Summ.

J., Dkt. #36, at 2) and will not unnecessarily repeat it here.  Plaintiffs will, however, add

additional information which will provide context for the controversy regarding CIA's position.

One of the key issues at the core of CIA's processing of Plaintiffs' FOIA/PA requests is

CIA's characterization of the "internal misunderstanding" it initially conveyed to Plaintiffs.

(Defs.' Mem. at 11 n.2.)    CIA maintains that its two statements on 20 September 2011 that it

was "able to locate responsive material" were "inaccurate" and were later "corrected."  (*See*

Answer, Dkt. #17, Exs. 6-7 ("Please be advised that our initial final response letter contained

inaccuracies regarding our search, and this amended response reflects the proper

determinations."); Meeks Decl. ¶ 9 ("These initial final responses incorrectly noted that the CIA

was 'able to locate responsive material.'"); *id.* ¶ 21 ("Despite the negative search results, PIPD

mistakenly issued response letters to Plaintiffs indicating that certain records were being

withheld."); *id.* ¶ 13 ("The amended response letters correctly reported that the CIA's search for

records that would reflect an open or otherwise acknowledged connection to Plaintiffs produced

no responsive records."); *id.* ¶ 22 ("[T]here were, in fact, no withheld records, since no records

reflecting an unclassified relationship with Plaintiffs existed.  . . . PIPD mistakenly claimed that

the CIA was withholding such records.").)  However, the exact nature of the "mistake" is not

explained in any of CIA's filings; the most that is said is that it was "based on an internal

misunderstanding."  (Defs.' Mem. at 11 n.2.)

For the purposes of understanding this controversy, it is important to note the *exact*

language used by CIA.  CIA never states that it has no records about Plaintiffs.  CIA never states

that it incorrectly stated that it *had* records about Plaintiffs.  CIA instead takes great care to state

only that it incorrectly stated that it had records *reflecting an unclassified relationship with*

*Plaintiffs* and that it subsequently corrected *that statement*.  Assuming *arguendo* that CIA's

statements are accurate, this fact pattern can only be explained by one of two possible scenarios:[1]

1. In September 2011, CIA performed two separate searches for records which
   would reflect an open or otherwise acknowledged Agency affiliation with two
   different people, and both searches yielded no responsive records.  Nonetheless,
   the CIA FOIA analyst(s) issued *two separate and distinct letters* (*see id.* at 2 n.1
   ("CIA treated the requests on behalf of Mobley and Islam separately.")), *both* of
   which "mistakenly" state not only that records were found, but also invoke *four*
   *specific exemptions* (FOIA Exemptions (b)(1) and (b)(3) and Privacy Act
   Exemptions (j)(1) and (k)(1) to justify their withholding.  Furthermore, an
   unknown number of senior officials *approve* these letters for mailing before
   affixing the Information and Privacy Coordinator's signature to them.

2. In September 2011, CIA performed two separate searches for records about two
   different people, and both searches yielded responsive records that the CIA FOIA
   analyst(s), after a thorough review, withheld under four exemptions.  CIA then
   informed Plaintiffs of these determinations.  Then, after litigation commenced,
   CIA determined that the responsive records actually revealed a classified

---

[1] Plaintiffs also concede that a third scenario may be responsible.  Between 20 September 2011 and 11 January 2012, the CIA may have classified the previously-unclassified fact of the existence or non-existence of records.  If that is the case, it must prove to the Court that it followed the heightened requirements of Executive Order 13526 regarding classification of information after receipt of a FOIA/PA request.  *See* E.O. 13526 § 1.7(d) (classification must be "accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of [E.O. 13526]").  None of CIA's filings address *when* this information was deemed to be classified.

connection to the CIA, and, as a result, retroactively attempted to retract its initial responses and state that it actually found no records *which would reflect an open or otherwise acknowledged Agency affiliation with Plaintiffs*, and that it was issuing a *Glomar* response with respect to records which would reveal a classified connection to the CIA.

Another key issue in controversy regarding CIA's processing of these FOIA/PA requests is the scope of its search for responsive records which actually *do* reflect an open or otherwise acknowledged Agency affiliation with Plaintiffs.  CIA omits from its recitation the fact that it has previously demonstrated that records about Mobley exist in its Open Source Center ("OSC"),[2] an unclassified component which, among other duties, provides translations of foreign news articles to other government agencies.  On 17 June 2011 the Defense Intelligence Agency ("DIA") referred thirty-five documents to CIA "that originated with news media sources."[3]  (*See* Letter from Bestrain to McClanahan of 5/4/12, attached as Ex. A.)  On 25 January 2012 CIA released twenty-eight of these referred documents to Plaintiffs and withheld the remainder.  (Letter from Viscuso to Crider of 1/25/12, attached as Ex. B.)  Despite the fact that Plaintiffs brought this discrepancy to CIA's attention in March 2012, CIA has still not conducted a search of the OSC

---

[2] *See* Centers in the CIA, *at* https://www.cia.gov/library/publications/additional-publications/the-work-of-a-nation/cia-director-and-principles/centers-in-the-cia.html (last accessed July 9, 2012).

[3] The original DIA FOIA/PA request is currently before the Court in the related case *Mobley v. DOD*, No. 11-2073.  However, there is a dispute between the parties as to whether the referral to CIA is part of that case.  Assuming that the Court finds that this referral is properly part of that case, Plaintiffs obviously do not suggest that CIA should reprocess those thirty-five records in *this* case, but only that they should search for *other* responsive OSC records.  If the Court finds that this referral is *not* properly part of that case, Plaintiffs maintain that CIA should be required to reprocess the previously withheld records (but not the released records) in the context of this case if it locates them in a search of the OSC.

for other responsive records.  (Defs.' Mem. at 10 (only Directorate of Support and National

Clandestine Service were searched).)

### Statutory Background and Standard of Review

With one exception, Plaintiffs accept Defendants' recitation of the Standard of Review.

However, Defendants' statements regarding the deference due to the Executive in national

security matters suggest a much broader reading than is supported by the case law.  It is true that

courts must give "substantial weight" to agency declarations in questions of national security.

However, this deference comes with two caveats.  First, it is important to heed this Circuit's

warning that "deference is not equivalent to acquiescence."  *Campbell v. DOJ*, 164 F.3d 20, 31

(D.C. Cir. 1998), quoting *King v. DOJ*, 830 F.2d 210, 218 (D.C. Cir. 1987).  "An agency cannot

meet its statutory burden of justification by conclusory allegations of possible harm.  It must

show by specific and detailed proof that disclosure would defeat, rather than further, the purposes

of FOIA."  *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977).

"An affidavit that contains merely a 'categorical description of redacted material coupled with

categorical indication of anticipated consequences of disclosure is clearly inadequate.'"  *PHE,*

*Inc. v. DOJ*, 983 F.2d 248, 250 (D.C. Cir. 1993), quoting *King*, 830 F.2d at 224.  "[T]he

affidavits must show, with reasonable specificity, why the documents fall within the exemption.

The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory

standards, or if they are too vague or sweeping."  *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir.

1979) (footnote omitted).  "The [D.C.] Circuit, though expressly disclaiming any attempt to

provide 'an encompassing definition of *conclusory assertions*,' noted that 'it is enough that

where no factual support is provided for an essential element of the claimed privilege or shield,

the label *conclusory* is surely apt.'" *Jarvik v. CIA*, 741 F. Supp. 2d 106, 120 (D.D.C. 2010),

quoting *Senate of Puerto Rico v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987).

Second, in cases involving national security issues, agencies are only accorded such

deference on the very limited question of the harm that disclosure could cause to national

security.  The Court is not allowed to defer to agency assertions of such things as: (1) the

adequacy of a search; (2) the assertion of an exemption not related to national security; (3)

whether or not an agency has waived a particular exemption (even one related to national

security); or (4) whether or not an agency has the authority to claim a particular exemption (even

one related to national security).  However, if an agency declaration provides a specific reason

for the assertion of a national security exemption, it should be bound by that criterion even if the

Court finds that the facts do not meet the requirement stated by the agency.

## ARGUMENT

### I.      CIA

CIA's response to Plaintiffs' FOIA/PA requests was improper for three reasons.  First,

CIA did not conduct a proper search for responsive records which reflect an open or otherwise

acknowledged Agency affiliation with Plaintiffs.  Second, the existence of responsive records

which reflect a classified or otherwise unacknowledged affiliation with Plaintiffs has been

officially disclosed, and accordingly CIA waived its right to issue a *Glomar* response.  Third,

even in the absence of a waiver, CIA improperly invoked Exemptions (b)(1) and (b)(3) to issue

its *Glomar* response.

### A.      CIA's Search for Records Reflecting an Unclassified Affiliation Was Inadequate

"[A]n agency responding to a FOIA request must conduct a search reasonably calculated

to uncover all relevant documents, and, if challenged, must demonstrate beyond material doubt

that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).  It is well established that an "agency is not expected to take extraordinary measures to find the requested records." *Garcia v. DOJ, Ofc. of Info. & Privacy*, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002); *see also Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.").  However, an agency may not "ignore what it cannot help but know" when faced with "a lead so apparent that the [agency] cannot in good faith fail to pursue it."  *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996).

In *Halpern v. FBI*, the Second Circuit stated that an answer received from a requester in response to an agency request for clarification would constitute a "clear and certain" lead that an agency must pursue.  *See* 181 F.3d 279, 289 (2d Cir. 1999) (finding that plaintiff could not argue that FBI failed to process cross-referenced files because he did not respond to agency inquiry asking if he wanted them included until after filing suit).  By the same token, a formal referral from another agency of hundreds of pages of records originating in a previously-unsearched agency component must constitute a similarly "clear and certain" lead that CIA must pursue. The fact that it did not, even after acknowledging the referral and releasing most of the referred records, borders on the irrational.  Accordingly, the Court should find that CIA improperly failed to search the OSC for responsive records.

Additionally, the Court should find that CIA improperly failed to search the FOIA office for records about Plaintiffs.  Despite CIA's assertions that "it is the Agency's policy to omit such records from the Agency's response to a pending request" (Meeks Decl. ¶ 14) and "PIPD officers believed this approach to be consistent with the terms of Plaintiffs' requests in the case" (*id.* ¶ 15), Plaintiffs' FOIA/PA requests were explicitly "for *all* CIA records about Mr. Mobley and Ms.

Islam."  (*Id.* (emphasis in original).)  Simply put, CIA's "policy" cannot supersede the plain language of Plaintiffs' request; it is in violation of FOIA for CIA to impose a requirement that "requests expressly seek[ ] records of previous FOIA, PA, or MDR requests."  (*See id.* at 7 n.7.)

**B.      CIA Has Waived Its Ability to Issue a *Glomar* Response**

It is well-established that publicly-known information cannot be withheld pursuant to an otherwise valid FOIA Exemption (b)(1) or (b)(3) claim.  *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).  However, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld."  *Id.*  This Circuit established three criteria for an item to be "officially acknowledged":

> First, the information requested must be as specific as the information previously released.   Second, the information requested must match the information previously disclosed; we noted, for example, that official disclosure did not waive the protection to be accorded information that pertained to a later time period. Third, we held that the information requested must already have been made public through an official and documented disclosure.

*Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990), citing *Afshar*, 702 F.2d at 1133.

This Circuit applied the *Afshar* "official acknowledgement" standard in the context of a *Glomar* response in *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007).  In that case, "[t]he CIA's *Glomar* response pinpointed the specific information at issue as the existence of Agency records . . . *vel non*."  *Id.* at 378-79.  "In the *Glomar* context, then, if the prior disclosure established the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information."  *Id.* at 379.  Even if an agency is found to have waived its ability to issue a *Glomar* response, it may still properly withhold any responsive records pursuant to appropriate FOIA/PA

exemptions, but it *must* process them and acknowledge their existence or nonexistence.  *Id.* at

380.

While no court has ruled definitively on whether a FOIA release constitutes an "official

acknowledgement" sufficient to defeat a *Glomar* response in a national security context, Judge

Jackson's recent opinion in *Memphis Publishing Co. v. FBI*, No. 10-1878, 2012 U.S. Dist.

LEXIS 11616 (D.D.C. Jan. 31, 2012), regarding the analogous FOIA exclusion 5 U.S.C. §

552(c)(2) is instructive on this point.  This provision states that a "criminal law enforcement

agency may treat . . . records [about a confidential informant] as not subject to the requirements

of [FOIA] unless the informant's status as an informant has been officially confirmed."  5 U.S.C.

§ 552(c)(2).  Because an agency acting under the direction of (c)(2) considers such records to be

"not responsive" to a FOIA request, it will neither confirm nor deny the existence or

nonexistence of such records.  In other words, it will issue a *Glomar* response.  *See Memphis*

*Publ'g*, 2012 U.S. Dist. at *13-14.  Accordingly, "[W]here an informant's status has been

officially confirmed, a *Glomar* response is unavailable, and the agency must acknowledge the

existence of any responsive records it holds."  *Boyd v. Crim. Div. of DOJ*, 475 F.3d 381, 389

(D.C. Cir. 2007).

In *Memphis Publishing*, the Federal Bureau of Investigation ("FBI") released a document

in response to a FOIA request about Ernest Withers which included the terms "Ernest Withers,

CI," "ME 338-R," and "Conf. Info."  *Memphis Publ'g*, 2012 U.S. Dist. at *27.  In a later

proceeding, the FBI then argued that this release did not constitute official confirmation of Mr.

Withers' confidential informant status because: (a) the Chief of the FOIA office did not have the

authority to officially confirm the status of confidential informants; and (b) even if he did, the

confirmation was inadvertent.  *Id*. at *29.  The court rejected both arguments, finding first that a

transmission to the plaintiffs by the Chief of the FOIA office as part of the agency's responses to the FOIA request was "an 'official' communication by an agency, made by personnel authorized to make such a disclosure." *Id.* at *27; *see also Valfells v. CIA*, 717 F. Supp. 2d 110, 118 (D.C. Cir. 2010) (suggesting, but not holding, that FOIA responses are "official to some degree").

Second, the court found, "As plaintiffs put it, 'inadvertent' is not the same thing as 'unofficial.'" *Memphis Publ'g*, 2012 U.S. Dist. at *30. The court supported this conclusion in part with language that could almost be describing the instant case:

> But more important, the claim of inadvertence being advanced here is a day late and a dollar short. It was first raised well after the disclosures, and it is entirely conclusory. In finding the claim of inadvertence to be unavailing here, the Court notes the following:
>
> - Plaintiffs' FOIA requests were of a high profile nature, and they involved matters of great public interest.
> ***
> - [Plaintiffs] [were] the sole subject[s] of the FOIA request[s], and the productions of documents made to plaintiffs were not large, so the agency had ample opportunity to review its production carefully.

*See id.* at *32-33.

In the instant case, CIA issued not one but two letters bearing the signature of the Information and Privacy Coordinator, the "Chief" of the CIA FOIA office. CIA's justification for the "mistake" is "entirely conclusory"; all CIA will say is that *a mistake was made*. The requesters were seeking records of a high profile nature that had been the subject of significant media interest. The requesters themselves were the sole subjects of the FOIA/PA requests, and there is no reason to believe that the volume of CIA records about them is large. Lastly, the fact that CIA went well beyond simply stating that it had responsive records in each request and actually took the time to invoke *four* specific exemptions to withhold responsive records calls this "oops" argument into serious

10

question.  *See id.* (finding that the fact that one of the released documents was redacted "suggest[ed] that someone looked at it closely").

Plaintiffs do not argue at this time that the evidence clearly demonstrates that CIA *has* records about them, but neither does the evidence demonstrate that the "mistake" was truly an innocent administrative error that should have no consequences.  Plaintiffs are willing to concede the possibility that the entire CIA FOIA operation may in fact be dysfunctional and devoid of any meaningful quality control, with analysts routinely making mistakes like invoking exemptions in boilerplate letters without bothering to look at the records first and supervisors routinely rubberstamping such determinations; it would certainly explain a lot.  *See Afshar*, 702 F.2d at 1131 (suggesting that "a general sloppiness in the declassification or review process" is sufficient reason to second-guess an agency's declaration despite the "substantial weight" standard).  However, as there is currently a genuine issue of material fact regarding the nature of CIA's "mistake" and the appropriate consequences for the agency, summary judgment is not appropriate on this issue without further information.[4]

## C.    CIA Improperly Claimed Exemptions (b)(1) and (b)(3)

Even if the Court finds that CIA did not officially acknowledge the existence of responsive records, CIA's invocations of Exemptions (b)(1) and (b)(3) are nonetheless improper.

---

[4] This argument necessarily implicates CIA's failure to search the Directorate of Intelligence ("DI") if the Court rejects its *Glomar* response.  CIA did not search the DI because it determined that there would be "virtually no chance that it would contain any responsive records reflecting an unclassified relationship with an individual."  (Email from Littleton to McClanahan of 6/22/12, attached as Ex. C.)  If the Court orders CIA to perform a search for records which reflect a classified affiliation, it should simultaneously order CIA to search the DI for responsive records.

1.      **Exemption (b)(1)**

CIA's invocation of Exemption (b)(1) fails for both a procedural and a substantive reason.  Procedurally, CIA has not demonstrated that it followed the appropriate steps when determining that the fact of the existence or nonexistence of responsive records ("*Glomar* fact") is classified.  Absent these procedures, the classification of the *Glomar* fact is improper.

Classification procedures are established by Executive Order 13526 ("E.O. 13526" or "the Order").  As a threshold question, it is undisputed that E.O. 13526 applies to *all* classification decisions.  "This order prescribes a *uniform* system for classifying, safeguarding, and declassifying national security *information*, including *information* relating to defense against transnational terrorism."  E.O. 13526 (emphasis added).  In other words, E.O. 13526 does not just apply to *records*, or even to *parts of records*; it applies to *information*.  *See*, *e.g.*, *id.* § 1.1(a) ("Information may be originally classified under the terms of this order only if all of the following conditions are met . . . .")

A *Glomar* fact is itself a piece of *information*.  *See Wolf*, 473 F.3d at 378-79 ("The CIA's *Glomar* response pinpointed the specific *information* at issue as the existence of Agency records . . . *vel non*.") (emphasis added).  The *Glomar* response is explicitly authorized in the Order.  E.O. 13526, § 3.6(a) ("An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors.").  (*See also* Meeks Decl. ¶ 30 (acknowledging that E.O. 13526 governs CIA's *Glomar* response).)  Accordingly, since E.O. 13526 establishes a *uniform* system for classifying *information*, and the *Glomar* response falls within this *uniform* system, an agency must follow the Order's procedures when classifying an intangible piece of information as a

*Glomar* fact just as it would when classifying a document.  CIA has offered no evidence that it has done so, as demonstrated below:

- "At the time of original classification, the original classification authority shall establish a specific date or event for declassification based on the duration of the national security sensitivity of the information.  Upon reaching the date or event, the information shall be automatically declassified." *Id.* § 1.5(a).  CIA has offered no information regarding *when* this *Glomar* fact was classified, let alone when it will be declassified.

- "No information may remain classified indefinitely." *Id.* § 1.5(c).  See above.

- "At the time of original classification, the following shall be indicated in a manner that is immediately apparent: . . . declassification instructions, which shall indicate one of the following: the date or event for declassification, . . . the date that is 10 years from the date of original classification, . . . [or] the date that is up to 25 years from the date of original classification." *Id.* § 1.6.  There is no information in the record that CIA even records its *Glomar* invocations in *any* form, let alone assigns them dates or events for declassification.

CIA cannot prove that it has properly classified this *Glomar* fact until it submits evidence demonstrating: (1) when it was classified; (2) when it will be declassified; (3) that it is not intended to remain classified indefinitely; and (4) that all three types of classification information listed above are recorded somewhere.  Until CIA supplies such evidence, summary judgment on this issue would be improper.

However, even if the Court finds that CIA followed the appropriate procedures when determining this *Glomar* fact to be classified, it does not meet CIA's own justification for

13

classification. CIA describes two types of intelligence targets[5] who would benefit from knowing whether or not CIA had records about them. The first type of target is someone who is engaged in "activities" and would take extra steps to keep them "undetectable" by CIA:

> [I]f the CIA admits that it possesses covert intelligence information about a particular individual, the CIA essentially admits that one or more of his activities have been detected by the CIA. Such an acknowledgement alerts this individual that he must take countermeasures to make his future activities undetectable by the CIA. If the individual's countermeasures are successful, the CIA loses its ability to monitor his activities.

(Meeks Decl. ¶ 37.) The second type of target is someone who "*should be of intelligence interest*" because of his "activities" but is not:

> [I]f the CIA denies that it possesses intelligence information about a particular individual who indeed should be of intelligence interest to the CIA, the CIA essentially admits to the individual that his efforts to conceal his activities have been successful. The result of the CIA's admission is that this individual would know that he could continue to act with impunity. Moreover, his associates, along with other intelligence operatives or terrorists, could soon begin to emulate the same successful pattern of undetectable activities with similar results.

(*Id.* ¶ 38.)

The problem with this justification is that, by its own terms, it only applies to people who are either *identified threats* or *unidentified threats*—people who *are* or *should be* "of intelligence interest." By CIA's own logic, it should not refuse to confirm or deny the existence or nonexistence of records about people who *are not* and *should not be* of intelligence interest. When applied to such a person, CIA's test breaks down. He clearly is not undertaking any "activities," and so he does not fit into the first category. As for the second category, the "efforts to conceal his activities" that have been successful so far consist entirely of *not doing anything wrong*. One would think that CIA would in fact *encourage* him to continue to *not do anything*

---

[5] Plaintiffs freely concede that they are not intelligence sources and that they have never worked

*wrong* "with impunity."  With respect to such a person's "associates" and other intelligence operatives or terrorists, the worst thing that could result from disclosure of the nonexistence of records about him would be that they would "emulate the same successful pattern" of *not doing anything wrong*.

Mobley should not be of intelligence interest to the U.S. Intelligence Community, and at least some parties in the U.S. Intelligence Community know it.  Plaintiffs submit to the Court an internal email chain between three individuals in the noted intelligence think tank Stratfor. (Email from Colvin to Burton of Apr. 9, 2010 [hereinafter Stratfor email], attached as Ex. D.) One of the parties, Fred Burton, is the Vice President of Intelligence at Stratfor and former Deputy Chief of the State Diplomatic Security Service.  Mr. Burton is a world-renowned counterterrorism expert.  *See*, *e.g.*, "Stratfor's Burton Interview about Bin Laden Death," Bloomberg TV, May 2, 2012, *at* http://www.bloomberg.com/video/69247770-stratfor-s-burton-interview-about-bin-laden-death.html (video interview) (last accessed July 10, 2012).  Another party, Scott Stewart, is the Vice President of Tactical Intelligence at Stratfor.  *See Scott Stewart – Tactical Intelligence*, PoliceOne.com, *at* http://www.policeone.com/columnists/Scott-Stewart/ (columnist bio) (last accessed July 10, 2012).  The third party, Aaron Colvin, was a "tactical analyst" at Stratfor and an expert on Al'Qaeda in the Arabian Peninsula ("AQAP").  *See* Lin Zhi, *How Dangerous is Al'Qaeda's Yemeni Arm?*, Xinhua, Aug. 31, 2010, *at* http://news.xinhuanet.com/english2010/indepth/2010-08/31/c_13470871.htm (last accessed July 10, 2012).  The Court should accept these senior officials' professional intelligence credentials as evidence of their connections to the U.S. Intelligence Community and their expertise regarding Al'Qaeda and AQAP.

for or with CIA.

In this email exchange, Mr. Colvin informed the others, "Heard from a very reliable source close to the folks who debriefed [Mobley] . . . . [The U.S. government] is convinced that they're going to kill him.  Also, he was not part of AQAP.  Security simply picked him up on suspicions and his shady affiliations."  (*See* Stratfor email.)  Because of these men's extensive connections to the U.S. Intelligence Community and the fact that they had a reasonable expectation of privacy in this candid email exchange, the Court should find that there is a genuine issue of material fact regarding whether or not Mobley should be of intelligence interest to CIA.  If the Court finds that Plaintiffs should *not* have been of intelligence interest, it should find that CIA's own described justification for refusing to confirm or deny the existence or nonexistence of records about them does not in fact justify such a response.

### 2.      Exemption (b)(3)

While Plaintiffs concede that both statutes cited by CIA—the National Security Act of 1947 and the CIA Act of 1949—are Exemption (b)(3) withholding statutes, CIA is applying neither of them correctly, and neither can be claimed as authority to issue a *Glomar* response in this case.

### a.      CIA lacks authority to invoke the National Security Act

Plaintiffs concede that prior to 2004, the National Security Act of 1947 vested the Director of Central Intelligence ("DCI") with the authority to protect "intelligence sources and methods."  However, in 2004 the National Security Act was amended, divesting this authority from the DCI and in fact eliminating the position altogether.  Instead, the Intelligence Reform and Terrorism Prevention Act ("IRTPA") created two new positions.  The Director of National Intelligence ("DNI") was created to oversee the Intelligence Community, and the Director of the Central Intelligence Agency ("D/CIA") was created to head CIA.  The IRPTA modified the

National Security Act to read: "[T]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). The National Security Act did not read: "The Director of National Intelligence and the Director of the Central Intelligence Agency shall protect intelligence sources and methods from unauthorized disclosure."

Despite this change in the law, CIA continues to invoke Exemption (b)(3) to withhold intelligence sources and methods from FOIA requests, citing the National Security Act. There is no evidence that it was ever authorized to do so by the DNI; in fact, the Office of the Director of National Intelligence ("ODNI") responded to a FOIA request for records about such authorizations with the statement that no such general agreements could be located. Pls.' Opp'n Defs.' Part. Mot. Dismiss Pls.' First Am. Compl., Dkt. #18, at 31 [hereinafter *NSC v CIA* Opp'n], *Nat'l Sec. Counselors v. CIA*, No. 12-284 (D.D.C. May 23, 2012) [hereinafter *NSC v. CIA*]. Simply put, after 2004 the ODNI is the only agency authorized by statute to claim the National Security Act as a withholding statute, and any other agency seeking to invoke that statute to withhold records under Exemption (b)(3) must be expressly authorized to do so by the DNI. As Judge Leon reasoned:

> The statute requires the Director of National Intelligence ("DNI") – not the State Department – to protect intelligence sources and methods. The DNI did exactly that when he requested the State Department take all necessary and appropriate measures to ensure the protection of intelligence sources and methods.

*Talbot v. CIA*, 578 F. Supp. 2d 24, 29 n.3 (D.D.C. 2008).[6]

---

[6] Interestingly, in *Talbot* the Government actually argued, "For this reason [protecting evidence of covert or clandestine interest in particular individuals or records], the DNI authorized the Department to take all necessary and appropriate measures in this case to ensure that intelligence sources and methods are protected from disclosure." Mem. Supp. Def's Mot. Summ. J., Dkt. #19, at 21, *Talbot* (Sept. 20, 2007).

This reasoning was applied specifically to CIA in *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479 (S.D.N.Y. 2010), which stated, "The amendments made by the IRTPA *transferred the authority* for protecting intelligence from the Director of the CIA to the DNI." *Id.* at 501 (emphasis added). The court did not state that the IRTPA "also vested the authority for protecting intelligence in the DNI," it stated that it *transferred* the authority. Authority can only be transferred if the original holder does not retain it. Unfortunately, the court then authorized CIA's withholdings because the IRTPA was not in effect at the time of the plaintiff's request, which rendered the question moot. *See id.* at 501 n.5.[7]

As in *Talbot* and *Amnesty International*, CIA relies now not upon a statute that it has authority to enforce, but upon a statute that another agency has been expressly delegated to enforce. In *National Security Counselors v. CIA* ("*NSC v. CIA*") (a recent case in which the undersigned is attempting to have this overall practice declared a violation of FOIA), CIA has alternately argued: (1) that the IRTPA did not divest it of that authority; and (2) that even if it did, Exemption (b)(3) does not incorporate statements of authority. Defs.' Mem. Supp. Defs.' Part. Mot. Dismiss Pls.' First Am. Compl., Dkt. #14, at 37-39 [hereinafter *NSC v. CIA* Mem.], *NSC v. CIA* (May 1, 2012).[8] Both of these arguments fail a close inspection.

Regarding the first argument, there are two reasons why such a position is unfounded. First, the National Security Act never vested *CIA* with the authority to protect intelligence

---

[7] It is curious, however, that despite being informed by the court in 2010 that it lacked independent authority to invoke the National Security Act as an Exemption (b)(3) withholding statute, CIA is still doing so and defending the practice.

[8] Given the similarity of the issues at play in *NSC v. CIA* and this case, Plaintiffs are citing CIA's arguments from that case and refuting them here in recognition of the fact that CIA's position is unlikely to have changed significantly in the past two months.

sources and methods, it vested *the DCI* with such authority.  The DCI was a human being, not an agency.  *See Nat'l Inst. for Military Justice v. DOD*, 404 F. Supp. 2d 325, 338 n.7 (D.D.C. 2005) [hereinafter *NIMJ*] ("The Secretary is not a Department of Defense Component.")  Furthermore, the DCI was not simply the head of CIA, he was the head of the entire Intelligence Community.  Any authority CIA claimed prior to 2004 in this regard was solely the result of the unique position held by the DCI, in that he could also speak for CIA as its Director.  However, by completely eliminating the position of DCI, Congress nullified any derivative authority CIA might possibly possess, instead vesting it solely with the DNI.

Similarly, even if the National Security Act *had* originally vested CIA with this authority, the IRTPA *removed it*.  *See Amnesty Int'l*, 728 F. Supp. 2d at 501.  Both the language of the statute and the legislative history are clear on this point.  Congresswoman Jane Harman, who was a manager of the IRTPA and a member of the Conference Committee on the legislation, stated that the bill before the House of Representatives "deals with the *consolidation of power within the DNI* to protect intelligence sources and methods.  . . . The bill *vests the DNI* with the authority to protect intelligence sources and methods, just as the Director of Central Intelligence *has exercised* that authority."  150 Cong. Rec. H 10994, 11004, 108th Cong., 23d Sess. (Dec. 7, 2004) (statement of Rep. Harman) (emphasis added).

In *NSC v. CIA*, CIA cites a litany of cases which prove, it maintains, that "[c]ourts have never concluded that these changes alter the CIA's responsibility to protect intelligence sources and methods or remove the CIA's ability to assert Exemption 3 over such materials."  *NSC v. CIA* Mem. at 38 (listing cases).  However, of the eleven cases listed, there is no evidence that this argument was even raised by the plaintiffs in a single one.  Plaintiffs have only been able to locate three cases—*Talbot*, *Amnesty International*, and *Gerstein v. CIA*, No. 06-4643, 2008 U.S.

Dist. LEXIS 82701 (N.D. Cal. Sept. 26, 2008)—where this argument was raised for *any* agency, not just CIA, and each of those cases supports Plaintiffs' position.

*Gerstein* deserves separate discussion for one major reason not present in *Talbot* and *Amnesty International*—CIA implicitly acknowledged its lack of authority to independently do exactly what it is advocating now. In that case:

> Gerstein initially challenged the propriety of the CIA's withholding pursuant to § 403-1(i)(1), on the ground the CIA lacked specific authorization for such withholding from the Director of National Intelligence. The CIA subsequently submitted supplemental documentation supporting such authorization, and Gerstein, in his sur-reply, concedes the CIA has met such requirement.

*Id.* at *30 n.16 (citations omitted). In other words, in his Opposition to CIA's dispositive motion Gerstein raised the exact same argument that Plaintiffs are raising now, and CIA did not oppose it, instead obtaining proper authorization from the DNI. While CIA's failure to raise this defense in that case is not probative, it is persuasive. Nonetheless, it is important to note that the court did explictly refer to the DNI's authorization as a *requirement*, not a *condition* or a *request*. (*Id.*)

Of the eleven cases cited by CIA in *NSC v. CIA*, only one actually addresses this issue at all—*ACLU v. DOJ*, 808 F. Supp. 2d 280 (D.D.C. 2011). The remainder of the cases fall into three primary categories:[9] (1) two cases which affirm CIA's invocation of Exemption (b)(3) without mentioning the DNI at all;[10] (2) two cases which mention the DNI in passing but do not

---

[9] The outlying case, *Moore v. CIA*, 666 F.3d 1330 (D.C. Cir. 2011), mentioned the DNI but did not rule on the merits of CIA's invocation of Exemption (b)(3) because the appellant did not challenge it. *Id.* at 1333. In that case, the only argument appellant raised was that CIA's *Glomar* response was improper because it had previously acknowledged the existence of the record in question. *Id.*

[10] *ACLU v. DOD*, 628 F.3d 612 (D.C. Cir. 2011); *Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007).

discuss the distinction between him and CIA;[11] and (3) five cases which do not consider the

change because the request at issue predated the IRTPA, rendering that statute inapplicable.[12]

Even *ACLU v. DOJ*, the one listed case that actually addresses the question, does not support

CIA's position.  In that case, Judge Collyer stated:

> Although § 403-1(i)(1) of the [National Security Act] provides that the "Director
> of National Intelligence shall protect information sources and methods from
> unauthorized disclosure," the CIA may rely upon this statutory provision to
> withhold records under FOIA.

808 F. Supp. 2d at 289 n.2.  However, this footnote is inapposite for two reasons.  First, it cites to

*Larson* for its authority, but *Larson* did not actually say this.  *Larson* simply affirmed CIA's

invocation of Exemption (b)(3) for a request which predated the IRTPA; the IRTPA was not

applicable to that request.

Second, like *Moore*, CIA's invocation of Exemption (b)(3) was not actually part of the

litigation in *ACLU v. DOJ*.  The only arguments the ACLU made were that CIA had previously

acknowledged the existence of drones and that drone strikes did not meet the definition of

"intelligence sources and methods."  *See* Pls.' Opp'n Def. CIA's Mot. Summ. J. & Cross-Mot.

Part. Summ. J., Dkt. #20, *ACLU v. DOJ* (Nov. 11, 2010), *available at*

http://www.aclu.org/files/assets/20__opp__to_cia_s_msj_and_cross-motion_11_01_10.pdf (last

---

[11] *Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262 (D.D.C. 2011); *Subh v. CIA*, 760 F. Supp. 2d
66 (D.D.C. 2011).

[12] *Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009); *Berman v. CIA*, 501 F.3d 1136 (9th
Cir. 2007); *Wolf*; *Schoenman v. FBI*, No. 04-2202, 2012 U.S. Dist. LEXIS 6994 (D.D.C. Jan. 23,
2012); *McGehee v. DOJ*, 800 F. Supp. 2d 220 (D.D.C. 2011).

accessed June 10, 2012).  Therefore, Judge Collyer's background footnote should not be

considered persuasive on this matter.[13]

As to CIA's second argument from *NSC v. CIA*, namely, that which official has authority

to do something is not relevant to Exemption (b)(3), this question has already been decided by

another court in this district.  In *NIMJ*, Judge Walton held that only the person authorized by a

statute (in that case, 10 U.S.C. § 130c) to withhold information could assert Exemption (b)(3) to

withhold the information.  404 F. Supp. 2d at 337.  10 U.S.C. § 130c(a) states that "the national

security official concerned . . . may withhold from public disclosure . . . sensitive information of

foreign governments."  *Id.* § 130(h)(1) defines the term "national security official concerned" as

the Secretary of Defense, the Secretary of Homeland Security, and the Secretary of Energy.  *Id.*

In contrast, the person who invoked Exemption (b)(3) to withhold information pursuant to 10

U.S.C. § 130c was Christine Ricci, a Department of Defense Associate Deputy General Counsel.

*Id.*  The court rejected the agency's argument, holding:

> 10 U.S.C. § 130c(h) clearly provides, at least in the context of this case, that only
> the Secretary of Defense may designate documents to be withheld under § 130c.
> The statute provides for no other person in the DoD to make such a determination,
> nor does it incorporate any language to suggest that an individual with authority to
> withhold documents under the FOIA can also withhold documents under § 130[c].
> This Court cannot read into a statute language that is clearly not there.

*Id.*  Judge Walton further noted that the Secretary of Defense remained free to cure this defect by

properly delegating authority to Ms. Ricci, but that "[f]ailure to do so . . . will result in this Court

---

[13] Furthermore, it appears that CIA conflated the standards for Exemptions (b)(1) and (b)(3) in
that case, perhaps leading to this discrepancy.  *See ACLU v. DOJ*, 808 F. Supp. 2d at 292-93
("The CIA has properly classified this fact under § 403-1(i)(1) of the [National Security Act], as
protected by FOIA Exemption 3.")  Agencies do not classify facts under the National Security
Act, they do so under E.O. 13526.  Similarly, classified information is not protected by
Exemption (b)(3), it is protected by Exemption (b)(1).

ordering the documents released." *Id.* at 337-38, 338 n.7.  This Court should follow the lead of

Judge Walton and hold that absent a proper delegation of authority from the DNI, CIA may not

invoke the National Security Act as a withholding statute.

CIA raises two minor additional arguments which warrant brief mention.  First, CIA

argues that it is authorized to continue withholding intelligence sources and methods information

pursuant to Exemption (b)(3) because "the [DCI] is charged with carrying out this directive [by

Executive Order 12333, as amended]."  (Defs.' Mem. at 19 n.4.)  This argument fails because

Exemption (b)(3) only exempts information "specifically exempted from disclosure by *statute*."

5 U.S.C. § 552(b)(3) (emphasis added).  An Executive Order is not a statute.  *Wash. Post Co. v.

Dep't of Health & Human Resources,* No. 80-1681, mem. op. at 1 n.2 (D.D.C. Dec. 4, 1980).

CIA can do many things to protect intelligence sources and methods pursuant to Executive

Order, but it may not invoke Exemption (b)(3).

Second, CIA argues that it is entitled to withhold "intelligence sources and methods"

information pursuant to Privacy Act Exemption (j)(1).  (Defs.' Mem. at 21.)  However, by CIA's

own admission, Exemption (j)(1) is merely "a corollary to CIA's statutory authority in the

[National Security Act] and the CIA Act."  (*Id.*)  CIA's analysis is supported by the fact that its

implementing regulation for this exemption, 32 C.F.R. § 1901.62(d)(1), was promulgated seven

years before the IRTPA, at a time when CIA *did* have this authority.  62 Fed. Reg. 32479, 32393

(June 16, 1997).  Accordingly, when the IRTPA divested CIA of the authority to independently

protect intelligence sources and methods, CIA's "corollary" Privacy Act exemption regulation

also became invalid – a regulation with no statutory authority authorizing it.  By CIA's own

reasoning, if the Court finds that the IRTPA divested it of the authority to invoke the National

Security Act as an Exemption (b)(3) withholding statute to protect intelligence sources and methods, it may consequently no longer invoke Exemption (j)(1) for that reason either.

### b. CIA improperly invoked the CIA Act

CIA's citation of the CIA Act as its (b)(3) withholding statute is a clear example of a systemic and chronic misinterpretation of that statute. CIA states, "CIA invoked the Central Intelligence Agency Act of 1949 . . . in support of its *Glomar* response. That provision, in pertinent part, exempts CIA from 'the provisions of any other law which requires the publication or disclosure of the . . . functions . . . *of the CIA*.'" (Defs.' Mem. at 19 (ellipsis in original) (internal citations omitted) (emphasis added); Meeks Decl. ¶ 42 ("[T]he CIA Act protects, among other things, functions *of the Agency*.") (emphasis added).)

In reality, the actual CIA Act is constructed much more narrowly. According to that statute:

> [T]he Agency shall be exempted from the provisions of . . . any other law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers *of personnel employed by the Agency*.

50 U.S.C. § 403g (emphasis added). Broken down, this means that the CIA Act authorizes the withholding of:

- the organization of personnel employed by the CIA;

- the functions of personnel employed by the CIA;

- the names of personnel employed by the CIA;

- the official titles of personnel employed by the CIA;

- the salaries of personnel employed by the CIA; and

- the numbers of personnel employed by the CIA.

It expressly does *not* authorize the withholding of the functions *of the CIA*.

However, CIA's position is not a new one.  Thirty-five years ago, this Circuit encountered this very argument in the landmark case *Phillippi v. CIA* (the original *Glomar* case).  That opinion is as applicable now as it was then:

> In its brief, however, the Agency suggests that § 403g's reference to withholding information about the "functions . . . of personnel employed by the Agency" allows the Agency to refuse to provide any information at all about anything it does.  This argument, on which our dissenting colleague relies, would accord the Agency a complete exemption from the FOIA.  *We do not think that § 403g is so broad.  Cf. Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1367-1368 (4th Cir.), *cert. denied*, 421 U.S. 908 (1975).

546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976) (emphasis added).  This reading was supported later in *Baker v. CIA*, in which this Circuit held, "Rather than reading section 403g in such a way that it is subsumed within section 403(d)(3), we believe instead that Congress intended to create an exemption in section 403g for *certain personnel information* that could be withheld from disclosure by the CIA without a separate intelligence or security justification."  580 F.2d 664, 668 (D.C. Cir. 1978) (emphasis added).  Lastly, to cement the fact that the CIA Act protected only *personnel* information, this Circuit explicitly contrasted it with another statute, the National Security Agency Act (Pub. L. 86-36), which, unlike the CIA Act, *did* sweep broadly to prohibit "disclosure of the organization or any function *of the National Security Agency*, or any information with respect to the activities thereof."  Pub. L. 86-36 § 6(a) (emphasis added).  The Circuit held:

> Appellants argue that Public Law No. 86-36 should be applied for Exemption 3 purposes in the same manner as similar statutes which concern the Central Intelligence Agency (CIA).  . . . But the statutes regarding the CIA exempt only "intelligence sources and methods" and the "organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."  Public Law No. 86-36, on the other hand, protects not only organizational matters of this sort, but also "any information with respect to the activities" of the NSA.  Any difference in FOIA Exemption 3 treatment of the CIA and NSA results necessarily from this difference in their respective exemption statutes.  Nowhere in the

legislative history of Public Law No. 86-36 does Congress express any intent to limit the effect of the clear statutory language. The Senate Report stated that the statute was consistent with legislation for other similarly secretive defense agencies, but it neither stated nor implied that it was identical in its exact scope of protection. Indeed, the House and Senate Reports both show that Congress was fully aware of the "unique and sensitive activities of the Agency," which require "extreme security measures." In light of the peculiar NSA security needs already discussed in this case, Congress certainly had rational grounds to enact for the NSA a protective statute *broader than the CIA's.*

*Hayden*, 608 F.2d at 1389-90 (emphasis added).

In anticipation of the argument that all of these seminal cases are more than thirty years old, and that the Court should instead give deference to Defendant in keeping with more recent district court cases, the Supreme Court's ruling last year in *Milner v. Dep't of the Navy* has fundamentally changed the landscape of this issue. When the Supreme Court identified the word "personnel" as the controlling term in Exemption (b)(2), it revived the interpretation of a narrow CIA Act focused on "personnel information" expressed in *Phillippi*, *Baker*, and *Hayden*. According to the Supreme Court:

The key word in that dozen—the one that most clearly marks the provision's boundaries—is "personnel." When used as an adjective, as it is here to modify "rules and practices," that term refers to human resources matters. "Personnel," in this common parlance, means "the selection, placement, and training of employees and . . . the formulation of policies, procedures, and relations with [or involving] employees or their representatives." Webster's Third New International Dictionary 1687 (1966) (hereinafter Webster's). So, for example, a "personnel department" is "the department of a business firm that deals with problems affecting the employees of the firm and that usually interviews applicants for jobs." Random House Dictionary 1075 (1966) (hereinafter Random House). "Personnel management" is similarly "the phase of management concerned with the engagement and effective utilization of manpower to obtain optimum efficiency of human resources." Webster's 1687. And a "personnel agency" is "an agency for placing employable persons in jobs; employment agency." Random House 1075.

--- U.S. ---, 131 S. Ct. 1259, 1264 (2011). Following the Court's lead, it begins quickly obvious that the prepositional phrase "of *personnel* employed by the CIA" is far narrower than the

alternative suggested by Defendant, "of *the CIA*."  Specifically, since CIA argues only that this *Glomar* fact reveals functions *of the Agency*, as opposed to the organization and functions *of personnel*, the Court should find that CIA has improperly invoked the CIA Act as an Exemption (b)(3) withholding statute.[14]

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied with respect to CIA.

## II.   STATE

State's response to Plaintiffs' FOIA/PA requests was improper for two reasons.  First, State failed to follow clear leads when performing its search for responsive records.  Second, State improperly determined that certain information was not subject to the Privacy Act.  Third, State improperly invoked Privacy Act Exemption (d)(5) and FOIA Exemptions (b)(1), (b)(6), (b)(7)(C), (b)(7)(E), and (b)(7)(F) to withhold information.

### A.   State's Search Was Inadequate

As discussed *supra*, when conducting a search for responsive records, an agency may not "ignore what it cannot help but know" when faced with "a lead so apparent that the [agency] cannot in good faith fail to pursue it."   *Kowalczyk*, 73 F.3d at 389.  As with the CIA's failure to search the OSC once it learned that responsive records could be found there, State has failed to search two components that it should have known were likely to contain responsive records.[15]

---

[14] As with the discussion of the National Security Act *supra*, such a finding will also necessitate a finding that the "corollary" invocation of Exemption (j)(1) is also improper.

[15] Before demonstrating State's failure to follow leads, it is first important to note that State *did* follow one lead, thereby waiving its ability to argue that it is not in the practice of following leads discovered late in the process.  (*See* Defs.' Mem.at 22 ("Based on information obtained from other responsive documents in the course of processing Mobley's request, State determined that its Office of Legal Adviser should also be tasked with a search.").)

Similarly, it should have performed a broader search of the Bureau of Diplomatic Security ("DS"), and it should have located a document clearly referenced in a processed record.

The greatest evidence of State's failure to conduct an adequate search can be discerned in the sketchy facts surrounding eighteen classified documents—Docs. X1-X18—about which State's public filings are virtually silent.  (*See* Defs.' Mem. at 27 n.9.)   These documents were located during the search of one of the searched components, although State will not confirm which one.  They were referred to another unidentified component, which determined that they must be withheld in their entirety.  (Walter Decl. ¶¶ 182-199.)  However, once State recognized that this unidentified component had created eighteen documents, it had a duty to perform a search of that component to determine if it possessed any *other* records.  Such a referral would constitute a "clear and certain" lead that the agency could not in good faith fail to pursue.  The record reflects, however, that State did in fact fail to pursue it, even after Plaintiffs directly requested that State search this unidentified component for records.

Second, according to State's *Vaughn* index, an agency attorney involved in an email exchange (Doc. O123) "also requests information for the Secretary of State."  (*Id*. ¶ 68.) Plaintiffs posit that an attorney involved in a high-level email exchange with multiple other senior officers would be unlikely to invoke the Secretary's name in such a way and then fail to give any information to the Secretary.  Despite this evidence that the Office of the Secretary would be likely to have records, State failed to search that component as well.

Third, State should have conducted a search of DS within a broader time frame.  State erred by only searching for records that were created around or after Mobley's seizure.  (*Id.* ¶¶ 22, 25 (time frame was January 2010-December 2011).)  Plaintiffs have always maintained that the U.S. government possessed records about Mobley predating his seizure, and State's search

belies this fact.  Plaintiffs maintain that State should perform a search of DS for all records created since 1 January 2009.

Lastly, State processed a record which referenced "an otherwise unidentified message in another communications channel."  (*Id.* ¶ 153.)  The nature and provenance of this "unidentified message" is clearly known to State, since it claims that "[t]his information relates to foreign government information and the foreign relations of the U.S., disclosure of which would likely harm U.S. national security as described above."  (*Id.*)  However, the fact that State refers to it as an "otherwise unidentified" message strongly suggests that State did not process the message itself for release, or else it would have been "identified."  State cannot withhold a record without invoking an exemption, and it cannot refuse to search for a record to avoid having to withhold it.

For the foregoing reasons, the Court should find that State failed to conduct an adequate search for responsive records.

**B.    State Improperly Determined that Certain Information Was Not Subject to the Privacy Act**

State improperly applied the Privacy Act in two ways.  First, it determined that three documents (Docs. DS001, A4, and A57) were not subject to the Privacy Act because they were obtained in electronic mailboxes, which are not "systems of records" under the Privacy Act.  (*Id.* ¶¶ 131-32, 148-51.)  Plaintiffs do not dispute that State electronic mailboxes are not "systems of records," but these documents are not emails; they are documents which properly exist in other systems of records.  Doc. DS001 is a formal report drafted by the Assistant Secretary of DS (*id.* ¶ 131), and Docs. A4 and A57 are telegrams (which are traditionally located in the Central Foreign Policy File) (*id.* ¶¶ 148, 150).  The mere fact that these *copies* were located in electronic mailboxes does not negate State's responsibility to properly locate them in their *proper* systems

of records and process them accordingly under the Privacy Act.  Therefore, the Court should find

that these documents are subject to the Privacy Act and order State to disclose them accordingly,

since records responsive to a FOIA/PA request must be exempt under *both* FOIA and the Privacy

Act before they can be withheld from a requester.  *Martin v. Office of Special Counsel, MSPB*,

819 F.2d 1181, 1184 (D.C. Cir. 1987).

       Second, State determined that even though some records were clearly records about

Plaintiffs, information *within* those records was not subject to the Privacy Act.[16]  (Defs.' Mem. at

38-39 ("[E]ven if an individual in entitled to access a record about himself under the Privacy Act,

he is not entitled to information in that record about other individuals who did not provide their

written consent for such disclosure.").)  Plaintiffs concede that the case law in this Circuit is split

on this issue, but maintain that the two cases cited by Defendants are less appropriate examples

than *Henke v. Dep't of Commerce*, No. 94-0189, 1994 U.S. Dist. LEXIS 21257 (D.D.C. Aug. 19,

1994), *rev'd on other grounds*, 83 F.3d 1453 (D.C. Cir. 1996), which held:

> [Defendant] thus wants the Court to find that information contained in one
> individual's records is exempt from the disclosure requirements of the Privacy
> Act simply because the same information is also contained in another individual's
> records.  This identical argument was considered and rejected in *Voelker v. I.R.S.*,
> 646 F.2d 332 ([8]th Cir. 1981) in which the [Eighth] Circuit stated that "if
> Congress had intended to shield from disclosure information in one person's
> record that pertains to another person, it could have and presumably would have
> added an exemption to sections 3(j) or 3(k)" of the Act.  646 F.2d at 335.  This
> Court agrees, and will therefore not create an exemption to the Privacy Act that
> Congress did not see fit to include itself.

---

[16] Plaintiffs challenge this determination in Docs. O147, O167A, O168A, O169A, and O179, all
of which were withheld in full.  (*Id.* ¶¶ 84-85, 96-99, 101-02.)  It also appears that Defendants
may have applied this determination to Docs. O107 (attached as Ex. E, p. 8), O141 (attached as
Sealed Ex. F, pp. 4-6), O155 (attached as Sealed Ex. F, pp. 7-9), O163 (attached as Ex. E, pp. 45-
46), and O164 (attached as Ex. E, p. 47), but these records are not mentioned in State's *Vaughn*
index.

*Id.* at *11; *see also Voelker*, 646 F.2d at 334 ("[I]t defies logic to say that  information properly contained in a person's record does not pertain to that person, even if it may also pertain to another individual.").

Compared with *Henke*, which draws directly on the 8th Circuit *Voelker* case for its holding, the cases cited by Defendants (*Haddon v. Freeh*, 31 F. Supp. 2d 16, 22 (D.D.C. 1998), and *Doe v. DOJ*, 790 F. Supp. 17, 22 (D.D.C. 1992)) both have as their source of authority the District of Colorado case *Nolan v. DOJ*, No. 89-2035, 1991 U.S. Dist. LEXIS 20337, at *30-31 (D. Colo. Mar. 18, 1991).  *Nolan* for its part cites to another district court case, *De Planche v. Califano*, 549 F. Supp. 685 (W.D. Mich. 1982), and *De Planche* is explicitly distinguished from *Voelker* based on the unique factual circumstances of the case.  *Id.* at 698.  In other words, while the authority for Plaintiffs' position can be traced back to the first circuit case to address the question, Defendants' position is based on a district court opinion that took great pains to distinguish itself from that circuit case based on a unique fact pattern.  The Court should adopt the *Henke* interpretation of this issue and find that this information is subject to the Privacy Act.

## C.  State Improperly Invoked Exemptions (d)(5), (b)(1), (b)(7)(E), and (b)(7)(F)

As an introductory matter, it is important to note that the Walter Declaration is woefully inadequate for the purposes for which it was intended, relying almost entirely on boilerplate language that merely parrots the statutory standards.  "Where the agency affidavits merely parrot the language of the statute and are drawn in conclusory terms, the court's responsibility to conduct de novo review is frustrated."  *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980).  Virtually no useful information is included, at least with respect to the withholdings challenged by Plaintiffs.

### 1.      Exemption (d)(5)

Privacy Act Exemption (d)(5) has been held to be similar to the attorney work-product privilege, and for the purposes of this discussion they can be treated virtually interchangeably. *See Martin*, 671 F.2d at 1187-89.  In order to be exempt under Exemption (d)(5), information must be "compiled in reasonable anticipation of a civil action or proceeding."  5 U.S.C. § 552a(d)(5).  While Plaintiffs concede that all the challenged information was compiled in anticipation of a civil action or proceeding, such anticipation was not *reasonable*.

The test established in this Circuit for whether or not the attorney work-product privilege applies is set forth in *In re Sealed Case*, 146 F.3d 881 (D.C. Cir. 1998).  "For a document to meet this standard, the lawyer must at least have a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable."  *Id.* at 884; *see also Cuban v. SEC*, 744 F. Supp. 2d 60, 81-82 (D.D.C. 2010) ("There are any number of tasks that an attorney could undertake on behalf of or communications that an attorney could have with [an agency component] . . . that never trigger the attorney work-product protection because litigation was not objectively reasonable.").  *Cf. Treppel v. Biovail*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006) (in context of evidence preservation, "the mere existence of a dispute . . . did not mean that the parties should reasonably have anticipated litigation").

As an initial point, it is noteworthy that while State invokes Exemption (d)(5) to withhold records under the Privacy Act, it never once invokes the attorney work-product privilege to withhold records pursuant to FOIA Exemption (b)(5).  (*See* Defs.' Mem. at 28-30 (invoking only deliberative process and attorney-client privileges).)  Such a glaring omission suggests that even State does not truly believe that these allegedly privileged documents rise to the level of the attorney work-product privilege.

32

State fails to properly invoke Exemption (d)(5) in three ways.  First, and most egregiously, it falsely claims that "Mobley had in fact already brought suit against the U.S. Government, alleging that the Government had unlawfully arranged his detention."  (Defs.' Mem. at 40; Walter Decl. ¶ 57 ("The advice [in Doc. O47][17] also refers to ongoing litigation between Mr. Mobley and the U.S. government regarding Mr. Mobley's allegations that the U.S. had arranged his unlawful proxy detention.").)  Prior to the filing of the related cases before this Court last fall, Mobley never filed any suit against any government agency, official, or other entity.  The allegation that he filed suit against the government sometime prior to September 2010 is entirely baseless.

Second, it argues that part of Doc. O119[18] was prepared in "reasonable anticipation of litigation involving the Department as Department employees could be called on to provide evidence or testimony concerning Mr. Mobley."  (Walter Decl. ¶ 63.)  The one common thread running through both attorney work-product and Exemption (d)(5) jurisprudence is that the "essential element of each case" is that "the attorney was preparing for or anticipating some sort of adversarial proceeding involving his or her client."  *Willingham v. Ashcroft*, No. 02-1972, 2005 U.S. Dist. LEXIS 22258, at *9 (D.D.C. Oct. 4, 2005).  "It is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by *opposing parties* and their counsel."  *In re Sealed Case*, 146 F.3d at 884 (emphasis added).  *See also Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 127 (D.C. Cir. 1987) (privilege extends to documents that "address the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome"); *In re Sealed Case*, 146 F.3d

---

[17] Attached as Ex. E, pp. 2-6.
[18] Attached as Ex. E, pp. 10-12.

at 885 (privilege covers "legal advisors protecting their agency clients from the possibility of future litigation").  Simply put, an attorney providing advice on how to give testimony in a case to which the agency *would not be a party* is not covered by Exemption (d)(5).  Such advice would likely be covered by the *attorney-client* privilege, but Exemption (d)(5) does not incorporate that or the deliberative process privilege.  *See, e.g.*, *Savada v. DOD*, 755 F. Supp. 6, 9 (D.D.C. 1991).  In order to be withheld under the Privacy Act, such communications must fall within the scope of Exemption (d)(5), and this communication does not.

Lastly, State's evidence falls far short of the "foreseeability" standard that governs the objective component of "reasonable anticipation" for the simple reason that it would be impossible for Plaintiffs to bring an adversarial action against any federal official, agency, or other entity for the reasons State allegedly fears:

- Allegations of unlawful proxy detention

  o Doc. O47 (Walter Decl. ¶¶ 56-57, attached as Ex. E, pp. 2-6)

  o Doc. O123 (Walter Decl. ¶¶ 67-68, attached as Ex. E, pp. 21-28)

  o Doc. O125 (Walter Decl. ¶¶ 73-74)

  o Doc. O126 (Walter Decl. ¶¶ 75-76, attached as Ex. E, pp. 36-39)

  o Doc. O130 (Walter Decl. ¶¶ 77-78)

  o Doc. O145 (Walter Decl. ¶¶ 82-83)

- Provision of consular services

  o Doc. O84A (Walter Decl. ¶¶ 58-59)

  o Doc. O121 (Walter Decl. ¶¶ 64, 66, attached as Ex. E, pp. 13-16)

  o Doc. O122 (Walter Decl. ¶¶ 65-66, attached as Ex. E, pp. 17-20)

  o Doc. O124 (Walter Decl. ¶¶ 69-70, attached as Ex. E, pp. 29-35)

- o Doc. O128 (Walter Decl. ¶¶ 71-72, attached as Ex. E, pp. 40-44)

- o Doc. C05129036 (Walter Decl. ¶¶ 168, 171, attached as Ex. E, pp. 66-71)

- o Doc. C05129040 (Walter Decl. ¶¶ 169, 171, attached as Ex. E, pp. 85-89)

- o Doc. C05129041 (Walter Decl. ¶¶ 170-71, attached as Ex. E, pp. 90-95)

- o Doc. C05129042 (Walter Decl. ¶¶ 172, 174)

- o Doc. C05129043 (Walter Decl. ¶¶ 173-74)

- o Doc. C05129046 (Walter Decl. ¶¶ 175-76)

- o Doc. C05129052 (Walter Decl. ¶¶ 177, 179, attached as Ex. E, pp. 72-78)

- o Doc. C05129053 (Walter Decl. ¶¶ 178-79, attached as Ex. E, pp. 79-84)

- o Doc. C05129057 (Walter Decl. ¶¶ 180-81, attached as Ex. E, pp. 64-65)

- Compliance with reporting procedures[19]

  - o Doc. O153 (Walter Decl. ¶¶ 88-89)

  - o Doc. 0154 (Walter Decl. ¶¶ 90-91)

- Unknown/unspecified issue

  - o Doc. O149 (Walter Decl. ¶¶ 86-87)

  - o Doc. O166 (Walter Decl. ¶¶ 92-93)

  - o Doc. O167 (Walter Decl. ¶¶ 94-95)

  - o Doc. O167A (Walter Decl. ¶¶ 96-97)

  - o Doc. O168A (Walter Decl. ¶¶ 98, 102)

  - o Doc. O169A (Walter Decl. ¶¶ 99, 102)

  - o Doc. O179 (Walter Decl. ¶¶ 101-02)

---

[19] There is no information in the record about what "compliance with reporting procedures" *is*, let alone how it relates to potential litigation against State.

With respect to potential claims of unlawful proxy detention, such claims would be precluded by the Alien Tort Claims Act ("ATCA").  28 U.S.C § 2680.  Section (h) excludes "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, [or] abuse of process."  *Id.* § 2680(h).  An exception is made for "investigative or law enforcement officers," but that term is narrowly defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  *Id.*  State employees do not fit this description.

Additionally, even if any potential lawsuits over unlawful proxy detention were not excluded under Section (h), Section (k) excludes "Any claim arising in a foreign country."  *Id.* § 2680(k).  Therefore any litigation of unlawful proxy detention would be doomed to failure, and any lawyer bringing such a case would be subject to sanctions.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (insubstantial lawsuits against high public officials "undermine the effectiveness of Government as contemplated by our constitutional structure" and warrant a "firm application of the Federal Rules of Civil Procedure").  Accordingly, any anticipation on an agency lawyer's part that Mobley would file suit regarding allegations of unlawful proxy detention would be objectively unreasonable.

With respect to provisions of consular services, the law is equally well settled that Mobley would be without a case should he try to litigate the matter.  Such an action, should he try to pursue it, would by necessity be based on State regulations and the Foreign Affairs Manual.  *See* 22 C.F.R. § 71.6 (requiring State officials to "extend every possible aid and assistance within their power to distressed American citizens); 7 Foreign Aff. Manual § 426.1(b) ("If the legal and human rights of U.S. citizens and nationals arrested abroad are to be adequately protected, we must be prepared to protest substantiated violations of those rights.").  However, these actions

are committed to agency discretion and do not create a private right of action. *See id.* § 426.3 ("[T]he level at which the protest is made and the method are normally left to the post's discretion."); *Rouse v. Dep't of State*, 567 F.3d 408, 418 (9th Cir. 2009) ("[W]e have found nothing in these regulations which indicates that they create a private right of action." "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

To bring this analysis to a close, it is important to note that the ATCA also explicitly excludes any such suits over matters such as those "anticipated" by State:

> [The ATCA] shall not apply to . . . any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). By extension, while no evidence has been offered regarding the nature of State's concerns regarding "compliance with reporting procedures" or the other unspecified potential litigation "reasonably anticipated" by State,[20] State has failed to meet its burden of showing that it would be reasonably foreseeable that Plaintiffs would initiate an adversarial proceeding against it on those grounds. The only adversarial proceedings Plaintiffs have engaged in (or *can* engage in) have been limited to these FOIA/PA suits, and a finding that State can withhold records under a reasonable belief that someone may request them under FOIA would swallow FOIA.

---

[20] The lack of any supporting evidence in these matters is itself sufficient grounds to deny summary judgment. *PHE*, 983 F.2d at 250.

In anticipation of Defendants' argument that Plaintiffs' position is precluded by

*Government Accountability Project v. Office of the Special Counsel, Merit Systems Protection*

*Board*, No. 87-0235, 1988 U.S. Dist. LEXIS 19484 (D.D.C. Feb. 22, 1988) ("*GAP*"), that case

actually supports Plaintiffs' position.  In *GAP*, the court held that the fact that the agency had

closed its investigation and made a "final disposition" did not render materials originally

previously protected by the attorney work-product privilege no longer protected, because at the

time they were created litigation was foreseeable.  *See id*. at #12-13.  For the purpose of this case,

the second half of that rationale is the most relevant.  At the time the records were created, the

agency *had a reasonable anticipation of a civil proceeding*.  In contrast, in this case Plaintiffs

argue that State could *never* have had a reasonable anticipation that Plaintiffs would file an

adversarial action against it for any of the reasons discussed in the Walter Declaration, which

distinguishes this case from *GAP*.

For the foregoing reasons, the Court should reject the above invocations of Exemption

(d)(5).

## 2.      Exemption (b)(1)

State has withheld eighteen documents in their entirety pursuant to Exemption (b)(1) and

redacted information from four documents.  In each instance of redaction, the invocation is

supported only by conclusory allegations of unspecified harm or expectations of confidence.[21]

The evidence does not support a finding that these withholdings were justified.

---

[21] The justifications for withholding documents in full were virtually nonexistent, stating only
that the documents were classified without mentioning which categories of classification were
being claimed.  (Walter Decl. ¶¶ 182-199.)  Plaintiffs respectfully request that the Court order
Defendants to supplement this information with greater detail about the classification
determinations.

As an initial matter, the record does not support a finding that Docs. O17 (Walter Decl. ¶¶ 54-55, attached as Sealed Ex. F, pp. 2-3), A57 (Walter Decl. ¶¶ 150-51, attached as Sealed Ex. H), S18 (Walter Decl. ¶¶ 152-53, attached as Ex. E, pp. 61-63, and Sealed Ex. F, p. 13), or X1-X18 are properly classified according to E.O. 13526 § 1.7(d).  According to that provision, an agency may classify information for which it has already received a FOIA request "only if such classification . . . is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of [E.O. 13526]."  E.O. 13526 § 1.7(d).  Doc. O17 was originally unclassified and was later classified CONFIDENTIAL by then-Director of Information and Management Services ("IMS") Margaret Grafeld on 19 March 2012.  (Sealed Ex. F at 2.)  Doc. S18 was originally designated "Sensitive But Unclassified" ("SBU") and was later classified CONFIDENTIAL by Ms. Grafeld on an unknown date, presumably after the submission of Plaintiffs' FOIA/PA request.  (Ex. E at 61.)[22]  Portions of Doc. A57 were originally marked SBU but were later classified by an unknown person at an unknown date.  (Sealed Ex. H at 4-5 (¶¶ 9-10 of the telegram).)  No information is given regarding when or how Docs. X1-X18 were classified.

State's attempt to claim that the Director of the Office of Information Programs and Services ("IPS") can satisfy this requirement on her own is not new to this Court.  In a case virtually identical to this one with respect to this issue, Judge Kennedy rebuffed a similar attempt once before:

---

[22] Ms. Walter's statement that this document was originally and currently classified SECRET (Walter Decl. ¶ 152) is belied by the classification markings on the record itself.  It was not originally classified SECRET, it was originally designated SBU.  It is not currently classified SECRET, it is currently classified CONFIDENTIAL.

> Because Ms. Grafeld is not the agency head, the deputy agency head, or the senior
> agency official, nor claims that she classified documents under the direction of
> such an official, she does not have proper authority to classify documents which
> the [plaintiff] had already requested under FOIA, although she may have had the
> authority to classify documents for which no FOIA request had been made.
> Therefore, because the State Department did not classify the documents currently
> withheld under Exemption 1 in accordance with proper procedure, the documents
> must be disclosed.

*Council for a Livable World v. Dep't of State*, No. 96-1807, 1998 U.S. Dist. LEXIS 23643, at

*12-13 (D.D.C. Nov. 23, 1998).

After *Council for a Livable World* was decided, State attempted once again to circumvent

the plain meaning of the Executive Order by issuing a Notice blanketly authorizing the Director

of IMS to do that which she could not do before.  (*See* 64 Fed. Reg. 7227 (Feb. 12, 1999).)

However, State cannot be allowed to reduce a specific provision designed to provide a higher

level of accountability for classification decisions made *after* a FOIA request to mootness by

simply publishing a single Notice in the *Federal Register* and then forgetting about it.  The

Executive Order is quite clear—the decision to classify a record already subject to a FOIA

request must be made *on a document-by-document basis* by one of three agency officials or under

their direction.  As in, one of those officials must make such a determination or direct another to

do so *each time* such classification is desired and *for each document*.  An agency cannot

circumvent this requirement simply by authorizing and directing someone else *once* to make the

decision on a document-by-document basis any time he/she needs to in the future.  Presumably

*every* classification decision is made on a document-by-document basis.  State's construction of

the Executive Order renders the heightened accountability language of § 1.7(d) "insignificant, if

not wholly superfluous."  *Duncan v. Walker*, 533 U.S. 167, 167 (2001).  Such a reading violates

one of the central canons of statutory construction: "This Court's duty to give effect, where

possible, to every word of a statute makes the Court reluctant to treat statutory terms as

surplusage." *Id.* (citing *United States v. Menasche,* 348 U.S. 528, 538-539 (1955)).[23]

State argues that three of the withheld documents are properly classified under E.O.

13526 § 1.4(b), four are properly classified under § 1.4(d),[24] and one is properly classified under

§ 1.4(g).[25]

> ### a. State has not convincingly demonstrated that the alleged "foreign government information" was obtained in confidence.

§ 1.4(b) allows for the classification of "foreign government information," which is

defined elsewhere in the Order, in pertinent part, as "information provided to the United States

Government by a foreign government or governments, an international organization of

governments, or any element thereof, with the expectation that the information, the source of the

information, or both, are to be held in confidence."  *Id.* § 6.1(s).

---

[23] In fact, under State's interpretation of this provision, all it would need to do to render § 1.7(d) *completely* meaningless is have the Under Secretary for Management place a Notice in the *Federal Register* stating, "I hereby authorize and direct any agency official possessing Original Classification Authority to classify information on a document-by-document basis consistent with the circumstances and procedures described in section 1.7(d) of Executive Order 13526." Then there would be no difference between classification decisions made before a FOIA request was filed and those made after one was filed.

[24] Plaintiffs are not challenging redactions made pursuant to § 1.4(d) except with respect to the reclassification procedures discussed *supra*.  However, since there is no information regarding which particular redactions belong to which classification reasons, a segregability analysis is necessary.

[25] State does not categorize Docs. X1-X18, rendering intelligent opposition to those claims impossible.  (Walter Decl. ¶¶ 182-99.)  Therefore, Plaintiffs respectfully request that the Court closely scrutinize these eighteen documents to ensure that they meet the strict requirements of E.O. 13526 § 1.4 and reject any conclusory assertions in Defendants' *ex parte*, *in camera* filings just as they would be rejected in a public filing.

One of the linchpin inquiries when making a determination regarding § 1.4(b) of E.O. 13526 is whether the information was provided to the United States "with the expectation that the information, the source of the information, or both, are to be held in confidence." E.O. 13526 § 6.1(s). "To carry this burden, the government need[s] to 'provide the court and [Plaintiff] with information sufficient to determine whether the source was truly a confidential one and why disclosure of the withheld information would lead to exposure of the source.'" *Rosenfeld v. DOJ*, 57 F.3d 803, 807 (9th Cir. 1995), quoting *Wiener v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991); *see also Wiener*, 943 F.2d at 980 (applying Exemption (7)(D) tests for express and implied grants of confidentiality to § 1.4(b) claims).

In order to establish an express grant of confidentiality, State "need only establish the [source] was told his name [or information] would be held in confidence." *Wiener*, 943 F.2d at 986. Given the "substantial weight" granted to declarations in national security matters (*King*, 830 F.2d at 217), this could likely be accomplished by saying as much in the Walter Declaration. Yet, Ms. Walter has not done so. More likely, given the vague and conclusory language of the Walter Declaration, State is maintaining the presence of an implied grant of confidentiality. However, State has not provided enough information beyond a rote statement that the material was "given in the expectation of confidentiality" to allow Plaintiffs or the Court to determine the legitimacy of these claims.

State, in fact, does not even provide any factual reasons that the Court should find the existence of an implied grant either. State's entire argument appears based on the questionable philosophy that *all* exchanges of information between foreign government officials and the United States come with implied grants of confidentiality. (*See* Walter Decl. ¶ 39 (calling it an "essential understanding").) If the Court adopts this position, then it would effectively remove

most if not all of State's records from the reach of FOIA, since by definition almost everything

State does involves the exchange of information with foreign governments.  Such a decision

would leave FOIA requesters at the mercy of the whims of State FOIA analysts, who could

decide that any piece of information they do not want to release is classified because it contains

"foreign government information."  Instead, this Court is encouraged to follow the more practical

lead of the 9th Circuit (vis-à-vis *Wiener*) and the District of Connecticut, which held:

> [T]he Grafeld declaration asserts that document E7 'was obtained in confidence
> from a foreign government[ ]' . . . .  Thus, it merely restates the standards
> promulgated in E.O. 13,292.  The declaration goes on to note that 'release of this
> information would hinder the ability to obtain such information in the future and
> damage relations with the government concerned.'  Such a statement is
> conclusory.  It does not provide sufficiently detailed and specific information as to
> why the information would hinder the ability to obtain such information in the
> future or why such secrecy is allowed by the terms of the executive order.

*El-Badrawi v. DHS*, 583 F. Supp. 2d 285, 314 (D. Conn. 2008).

The Court should find that the conclusory statements of confidentiality offered to

withhold information from Docs. O17 (Walter Decl. ¶¶ 54-55, attached as Ex. E, pp. 2-3), A57

(Walter Decl. ¶¶ 150-51, attached as Sealed Ex. H), and S18 (Walter Decl. ¶¶ 152-53, attached as

Ex. E, pp. 61-63, and Sealed Ex. F, p. 13) do not sufficiently allege an express or implied grant

of confidentiality, thereby rendering § 1.4(b) inapplicable.  For Doc. O17, State simply states that

the information was "expressed in confidence."  (Walter Decl. ¶ 55.)  However, this statement is

a resounding thunderclap compared to the complete lack of any mention of *any* expectations of

confidence regarding Docs. A57 and S18.  (Walter Decl. ¶¶ 151, 153.)

  **b.**  **State has not convincingly demonstrated that the information redacted from Docs. O224 and A4 relates to vulnerabilities and protective services.**

  § 1.4(g) allows for the classification of information related to "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." E.O. 13526 § 1.4(g). State has withheld information from Docs. O224 (Walter Decl. ¶¶ 131-32) and A4 (Walter Decl. ¶¶ 148-49, attached as Ex. E, pp. 44-60) pursuant to this provision.

  Plaintiffs concede that some of the information redacted in these document is properly exempt. For that reason, Plaintiffs are only challenging the redaction of information *about* Mobley. Based on the conclusory assertions in the Walter Declaration, it is impossible to know if any of the information about Mobley is classified pursuant to § 1.4(g). However, Plaintiffs maintain that information about Mobley cannot be said to "relate[ ] to vulnerabilities of U.S. installations and protective services relating to U.S. national security, including defense against transnational terrorism." (*Id.* ¶ 149.)

  For the foregoing reasons, the Court should find that the challenged Exemption (b)(1) withholdings are unsupported by the evidence and deny summary judgment.

  **3.**  **Exemptions (b)(6)/(b)(7)(C)**

  Plaintiffs only challenge the redactions made under these Exemptions in Docs. O107 (attached as Ex. E, p. 8), O108 (Walter Decl. ¶¶ 60-61, attached as Ex. E, p. 9), O141 (attached as Sealed Ex. F, pp. 4-6), O155 (attached as Sealed Ex. F, pp. 7-9), O163 (attached as Ex. E, pp. 45-46), O164 (attached as Ex. E, p. 47), O218 (Walter Decl. ¶¶ 146-47, attached as Sealed Ex. G, pp. 3-5), and S5 (attached as Sealed Ex. G, p. 2). Since only two of these documents are

discussed in the *Vaughn* index, Plaintiffs cannot address the remainder with any degree of specificity.

Plaintiffs limit their challenge to the withholding of Doc. O108 to just the domain portion of the law enforcement official's email address.[26]   (*See* Walter Decl. ¶ 61.)   The domain of an email address is not itself personally-identifiable information and is not properly protected by these exemptions.

Plaintiffs challenge Docs. O218 and S5 to prove a point, namely, that State's assertions of Exemptions (b)(6) and (b)(7)(C) were not made with any significant degree of attention, and moreover, that the Walter Declaration was drafted from meaningless boilerplate language without any care for accuracy.   State redacted Islam's information from these two documents, despite the fact that she provided a privacy waiver (and was in fact a requester).   However, State did not simply admit its error and move along.   Immediately after stating that Islam's passport number was "inadvertently withheld," Ms. Walter appears to *defend* the action, stating:

> Release of this passport number would constitute a clearly unwarranted invasion of her personal privacy.   It is therefore exempt from release under FOIA exemption (b)(6).   This number does not constitute a record about Mr. Mobley and is not, therefore, releasable to Mr. Mobley under the Privacy Act without the written consent of Ms. Islam.   There is no additional non-exempt material that may be segregated and released.

(Walter Decl. ¶ 147.)   Plaintiffs do not suggest that Ms. Walter actually believes both (a) that the redaction was a mistake because Islam provided a waiver and (b) that the redaction was justified because Islam did not provide a waiver.   Instead, this paragraph is indicative of something far more insidious – Walter did not even review this statement before she signed it.   This statement suggests that the general descriptions of harm that pepper this declaration were simply cut and

---

[26] In other words, the part after the @ sign.

pasted from other locations without any thought to whether or not the specific information being

withheld warranted such protection.  Any deference due to her declaration regarding

withholdings must suffer in light of the "general sloppiness" this demonstrates about the review

process.  *See Afshar*, 702 F.2d at 1131.

### 4.        Exemption (b)(7)(E)

Exemption (b)(7)(E) allows an agency to withhold information if production would

"disclose techniques and procedures for law enforcement investigations or prosecutions, or

would disclose guidelines for law enforcement investigations or prosecutions  if such disclosure

could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

However, Exemption (b)(7)(E) does not exempt *all* investigative techniques and procedures from

disclosure; it is limited to techniques and procedures unknown to the public.  *See*, *e.g.,*

*Albuquerque Publ'g Co. v. DOJ,* 726 F. Supp. 851, 858 (D.D.C. 1989) (ordering agency to

explain further why certain techniques are considered unknown to the public); *Jaffe v. CIA*, 573

F. Supp. 377, 387 (D.D.C. 1983) (exemption applies to information regarding "obscure or secret

techniques"); *Dunway v. Webster*, 519 F. Supp. 1059, 1082-83 (N.D. Cal. 1981) (exemption is to

be applied only to techniques and procedures generally unknown to the public and, absent any

explanation from the government, court would not assume that disclosure would result in

revelation of investigative techniques which were so unique as to warrant exemption).

Defendants' arguments on this exemption are wholly insufficient to meet this test.  Every

invocation of the exemption to withhold information merely parrots the statutory language

without any further detail:

- Doc. O147 – "involves reference to a screening technique and procedure used by law enforcement organizations for the enforcement of immigration laws" (Walter Decl. ¶ 85)

- Docs. O153, O154 – "related to screening techniques in an anti-terrorism context" (*Id.* ¶¶ 89, 91)

- Doc. O177 – "includes reference to a screening technique and procedure used by law enforcement organizations for the protection of U.S. national security from terrorist threats" (*Id.* ¶ 104)

- Docs. O212 (attached as Ex. E, pp. 48-49), O213, O216 (attached as Ex. E, p. 50), O217, O222 (attached as Ex. E, p. 51), O223 (attached as Ex. E, pp. 52-53), O224 (attached as Ex. E, p. 54) – "would disclose [State] procedures involved in [passport processing]" (Walter Decl. ¶¶ 116, 118, 120, 122, 126, 128, 130)

- Doc. O219 – "requests guidance . . . in complying with a directive in the Foreign Affairs Manual" (*Id.* ¶ 124)

- Doc. O193 – "would disclose investigation techniques of U.S. government agencies" (*Id.* ¶ 138, attached as Sealed Ex. F, pp. 10-12)

- Docs. A4 (attached as Ex. E, pp. 55-60)[27] and A57 (attached as Sealed Ex. H) – "disclose investigat[ive] techniques" (Walter Decl. ¶¶ 149, 153)

Defendants have not met their burden of adequately demonstrating that the controverted information pertains to law enforcement methods *unknown to the public*. The Court should be especially suspicious of the suggestion that a simple "Name Check" is an unknown technique.

(*Id.* ¶ 153.)  Therefore, Plaintiffs are entitled to all of the controverted information being withheld under Exemption (b)(7)(E).  Should the Court question this assertion, it should review the information *in camera* before issuing its decision.

**D.      Segregability**

"Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  "This rule of segregation applies to all FOIA exemptions."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).  "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  *Id.*

To meet its burden, State must provide a "statement of its reasons" for not segregating and "describe what proportion of the information is non-exempt and how that material is dispersed throughout the document."  *Mead Data Cent.*, 566 F.2d at 261.  "Conclusory language in agency declarations that does not provide a specific basis for segregability findings by a district court may be found inadequate."  *Judicial Watch v. Dep't of the Treasury*, 2011 U.S. Dist. LEXIS 74121, at *34, (D.D.C. July 11, 2011), citing *Animal Legal Def. Fund, Inc. v Dep't of the Air Force*, 44 F. Supp. 2d 295, 301 (D.D.C. 1999).

State's only concession to the segregability requirement is a single boilerplate statement at the end of each entry in the *Vaughn* index: "There is no additional material that may be

---

[27] Plaintiffs only challenge the withholding of information about Mobley.  Similarly, Plaintiffs challenge State's assertion that the information about Mobley could "endanger the personal safety of an individual."  (Walter Decl. ¶ 149 (invoking Exemption (b)(7)(F).)

segregated and released."[28]  (*See*, *e.g.*, Walter Decl. ¶ 57.)  Not surprisingly, State has already

been criticized by one court for just this practice, *twenty years ago*:

> All of Marchak's insufficient indexes fail to discuss segregability.  Document 266
> is a classic example.  The index describes information contained in the document
> and particularizes the anticipated harm from release of the document.  It then
> appends a boilerplate statement found at the end of *every single Marchak index*,
> which merely asserts that "no segregation of non-exempt, meaningful information
> can be made for disclosure."  This is entirely insufficient.

*Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State*, 818 F. Supp 1291, 1300

(N.D. Ca. 1992).

In the face of such conclusory statements, "the Court must therefore conclude that

defendants have not demonstrated that the factual information in the documents is not reasonably

subject to segregation . . . [and] order [State] . . . to release the challenged documents or submit

an amended *Vaughn* index concerning them."  *Wilderness Soc'y v. Dep't of the Interior*, 344 F.

Supp. 2d 1, 19 (D.D.C. 2004).

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied

with respect to State.

## III.    OPMG

On 5 March 2012 State referred eleven records to the U.S. Army for review.  (Hargitt

Decl. ¶ 3.)  These records were ultimately processed by OPMG, which withheld them all in their

entirety under FOIA Exemption (b)(1) and Privacy Act Exemption (k)(1).  (*Id.* ¶¶ 5-7.)  OPMG

has offered no justification for these withholdings.

---

[28] The exact wording differs based on whether the document is classified, withheld in full, or
withheld in part, but the differences are negligible.

OPMG's withholdings are potentially improper for three reasons.  First, while Mr. Hargitt states that the records are currently classified SECRET, he provides no information regarding their classification status as of 22 July 2010, the date when Plaintiffs submitted their FOIA/PA request to State.  If any of these documents were not classified at that time, they could be properly classified "only if such classification . . . is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of [E.O. 13526]."  E.O. 13526 § 1.7(d).  Mr. Hargitt does not allege that he is a proper "senior agency official" or that he classified these records on a document-by-document basis under the direction of one.  Therefore, these classification determinations may not satisfy the procedural requirements of E.O. 13526 § 1.7.

Second, the information in these records may not properly meet the requirements of E.O. 13526 § 1.4, especially if it is claimed to be "foreign government information."  Because OPMG does not categorize these records, Plaintiffs respectfully request that the Court closely scrutinize these eighteen documents to ensure that they meet the strict requirements of E.O. 13526 § 1.4 and reject any conclusory assertions in Defendants' *ex parte*, *in camera* filings just as they would be rejected in a public filing, applying all the arguments raised in Part II(C)(2) *supra*.

Lastly, the evidence does not explain why OPMG possesses records about Plaintiffs in the first place, and its maintenance of such records appears to be in violation of its mandate.  (*See* Hargitt Decl. ¶ 2 (describing OPMG responsibilities).)  Neither Plaintiff is or has ever been a member of the U.S. military, nor have they had any relationship to the Army or in fact any military branch.  Neither Plaintiff is or has ever been in military custody or the subject of a military investigation.  Neither Plaintiff is or has ever been an Enemy Prisoner of War or

Detainee.  Mobley is a U.S. citizen civilian who is not a member of any terrorist organization and who was seized and incarcerated by a foreign power.  The source of OMPG's jurisdiction to maintain records about him is unknown, but based on Mr. Hargitt's recitation of OMPG responsibilities, the keeping of such records is against OMPG rules.

If OMPG has no jurisdiction over Plaintiffs and has violated its mandate, it cannot withhold records to conceal its violations of the law.  *See* E.O. 13526 § 1.7 ("In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; . . . or (4) prevent or delay the release of information that does not require protection in the interest of the national security."  *Cf. Fitzgibbon*, 911 F.2d at 765 (holding that CIA could withhold records about domestic operations because they were "part of CIA's mandate").  Furthermore, there is a strong public policy interest in agencies being required to follow their mandates that advocates against allowing an agency in violation of its mandate to conceal the evidence of its wrongdoing.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied. Defendants should also be ordered to either provide a more sufficient *Vaughn* index, to provide the records still at issue to the Court for *in camera* review, or to release the records still at issue to Plaintiffs.

Date:   July 10, 2012

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
1200 South Courthouse Road
Suite 124
Arlington, VA  22204
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*